IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


**ROBERT RUDOLPH,**                                                                   04-CV-1375-BR

       Plaintiff,                                           OPINION AND ORDER

v.

**ELI LILLY AND COMPANY,**
an Indiana corporation,

       Defendant.


**THOMAS K. DOYLE**
Bennett, Hartman, Morris & Kaplan, LLP
111 S.W. Fifth Avenue, Suite 1650
Portland, OR  97204
(503) 227-4600

       Attorneys for Plaintiff

**ELLEN E. BOSHKOFF**
**CRAIG M. BOROWSKI**
Bake & Daniels LLP
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46220
(317) 237-0300

**JAY T. JORGENSEN**
Sidley Austin Brown & Wood LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8020

**AMY R. ALPERN**
Amburgey & Rubin, P.C.
1750 S.W. Harbor Way, Suite 450
Portland, OR  97201
(503) 221-0309

>Attorneys for Defendant

**BROWN, Judge.**

This matter comes before the Court on Defendant's Motion for Summary Judgment (#22).  Plaintiff Robert Rudolph, a former employee of Defendant Eli Lilly and Company, brings this action against Lilly for violation of Or. Rev. Stat. § 659A.230(1).  Plaintiff asserts Lilly violated the statute when it constructively discharged him in retaliation for Plaintiff's complaints of illegal activities by Lilly employees.

For the reasons that follow, the Court **GRANTS** Defendant's Motion.

## **FACTS**

The following facts are drawn from the admissible evidence in the record and viewed in the light most favorable to Plaintiff.  The majority of the evidence consists of Plaintiff's

deposition testimony.

    Plaintiff worked as a pharmaceutical sales representative for Lilly in Medford, Oregon, from 1976 until 2002. Before he was employed by Lilly, Plaintiff was a pharmacist. At all material times, Brett Forrest was Plaintiff's manager at Lilly and Bernie Tobin was Forrest's manager.

    In June or July 2001, Plaintiff attended a sales meeting in San Francisco at which Forrest was also present. At that meeting, two Lilly sales representatives, Marisa Oliver and Amber Clifton, made a presentation regarding their method for getting patients to switch from daily Prozac to Prozac Weekly. Lilly's patent on daily Prozac was scheduled to expire in August 2001, but its patent on Prozac Weekly was continuing.

    According to Oliver and Clifton, they would visit physicians' offices on weekends and, with the help of the physicians or their staff, obtain the names and addresses of patients who had been prescribed Prozac. The sales representatives would then send letters to the patients promoting Prozac Weekly. The letters would go out on the physicians' stationery, but Oliver and Clifton addressed the letters and provided the stamps.

    During the presentation, Plaintiff voiced his strong objection to this practice and explained he believed it violated patient confidentiality and Lilly's Good Promotional Practices

3 - OPINION AND ORDER

(GPP). After Plaintiff stated his objections, the presentation stopped.

Plaintiff believed Forrest was upset with him for voicing his objection, but Plaintiff admits Forrest never said anything to him about it. Plaintiff testified Lilly listened to and heeded his objection, and the practice stopped as far as he knows.

In late November 2001, Plaintiff received a voicemail message from Forrest in which Forrest told Plaintiff that he would be receiving a voicemail from Matt Hutchings of Lilly outlining a way to increase the use of performance scripts[1] and Prozac Weekly in Plaintiff's sales district. Forrest also told Plaintiff to pay attention to the Hutchings voicemail message.

Before Plaintiff received the voicemail from Hutchings, he received a telephone call from Evan Daywitt and Bill Kelly, Lilly sales representatives. Daywitt and Kelly told Plaintiff they had participated in a conference call that morning during which they were told about a program for promoting Prozac Weekly. Daywitt and Kelly described to Plaintiff a program similar to the one presented by Oliver and Clifton at the July 2001 meeting. Specifically, the program involved sales representatives obtaining from physicians the names of patients who were on

---

[1] "Performance scripts" are prescriptions that are processed by a third party and paid for by Lilly in place of free samples.

4 - OPINION AND ORDER

Prozac, faxing performance scripts to pharmacies for these patients, picking up the prescriptions at the pharmacies, and returning the filled prescription to the physicians' offices, all without the knowledge or consent of the patient.[2] According to Plaintiff, both Daywitt and Kelly expressed their concern about this practice. Kelly, a pharmacist, was particularly dismayed about the program and questioned whether it was legal under federal and state pharmacy laws.

Later that day Plaintiff received the voicemail from Hutchings, which was directed to all Lilly employees in Plaintiff's district. Hutchings was the "Prozac product champion" for Lilly. In the voicemail, Plaintiff states Hutchings described a program for promoting Prozac Weekly. Again, the program was similar to the one presented by Oliver and Clifton and involved obtaining patient names, filling prescriptions, and delivering the drugs to the doctors' offices for delivery to the patient.

---

[2] Plaintiff testified at his deposition that Daywitt and Kelly related to him the program that had been described to them in their conference call. The record does not contain Daywitt's or Kelly's testimony nor does it contain any evidence identifying the speaker on the conference call. The description of the program, therefore, contains multiple layers of hearsay and is not admissible for its truth; *i.e.*, to establish the described program actually existed or was implemented by Lilly. The Court considers Plaintiff's testimony describing the program only for the limited purpose of providing background for Plaintiff's later complaints about the alleged program.

5 - OPINION AND ORDER

Plaintiff believed this program violated laws regarding patient confidentiality and also resulted in misrepresentation of Lilly's sales figures because the performance scripts were counted as sales when, in fact, the drugs provided through this method were paid for by Lilly. Plaintiff also was concerned about how the program affected Lilly's compensation system. According to Plaintiff, Lilly's sales representatives were compensated on a bonus system based on the number of prescriptions written. Plaintiff believed the performance scripts were counted as prescriptions for purposes of calculating bonuses and, therefore, unfairly rewarded people who participated in an activity that Plaintiff believed was illegal.

Plaintiff forwarded the Hutchings voicemail to Tom Kidd, his former manager at Lilly who was then working as a compliance officer at Lilly's home office. Plaintiff discussed his concerns about the program with Kidd. According to Plaintiff, Kidd agreed the program described in the Hutchings voicemail violated Lilly's GPP. Shortly after Plaintiff forwarded the voicemail to him, Kidd apparently instructed Lilly managers to stop the practice. Forrest sent out a voicemail message to sales representatives in his district instructing them not to use the method described in the Hutchings voicemail. Plaintiff was satisfied with Kidd's resolution of the issue.

In January 2002, Plaintiff attended a district meeting in

6 - OPINION AND ORDER

Sacramento, California. Forrest and Tobin were also present. During the meeting, a presentation was made regarding the successful use of performance scripts by sales representatives to increase their sales numbers. Plaintiff raised his hand and objected to the use of performance scripts instead of free samples. Plaintiff stated his concern that performance scripts are more expensive for Lilly and "add no money to the bottom line of our coffers." Plaintiff stated he did not appreciate that practice as a stockholder. Plaintiff testified he did not remember whether he stated at the meeting that he thought the use of performance scripts was illegal or whether he just said it was unethical and a bad business practice. According to Plaintiff, other people at the meeting also questioned the use of performance scripts.

Shortly after the Sacramento meeting, Plaintiff decided to take medical leave on the advice of his doctor due to depression, sleep apnea, and stress. Plaintiff had been seeing a physician for his sleep apnea for several months and recently had received the results of some tests that triggered his decision to take medical leave.

On January 30, 2002, Forrest flew to Medford and met with Plaintiff briefly at the airport. Forrest told Plaintiff that people had complained about Plaintiff's disruption of the Sacramento meeting, and Forrest stated Plaintiff's behavior at

7 - OPINION AND ORDER

the meeting was unacceptable.  Forrest would not tell Plaintiff
who had complained.  Forrest asked Plaintiff what bothered him,
and Plaintiff again told Forrest that the Prozac promotion was
illegal.  Plaintiff also told Forrest he was the one who "turned
him in" to Tom Kidd by forwarding the Hutchings voicemail.
According to Plaintiff, Forrest became angry and asked Plaintiff
why he had not come to Forrest first.  Plaintiff responded, "If I
have to come to tell you you made a GPP violation, I'm going to
the wrong person.  That when it was that bad, that's why I went
to Tom Kidd."  Forrest then told Plaintiff he was not a team
player and he needed to change his behavior or there would be
repercussions.  Plaintiff, however, also testified the meeting
with Forrest ended on a positive note:  Forrest told Plaintiff
that he was obligated to report anything he thought was a
violation of Lilly's GPP and should report any further violations
that he observed.  At the end of the meeting, Plaintiff told
Forrest, "You're a good guy.  Thanks for listening to me," and
hugged him.  Plaintiff then told Forrest that he was going to
take medical leave, and the meeting ended.

    Plaintiff went on paid medical leave from February 1 to
March 30, 2002.  During his medical leave or shortly after
returning to work, Plaintiff decided to retire from Lilly.

    Plaintiff returned to work April 1, 2002.  Shortly
thereafter, he told Forrest that he planned to retire at the end

8 - OPINION AND ORDER

of June 2002. Plaintiff's last day of work for Lilly was June 14, 2002. From June 14 to June 30, 2002, Plaintiff used his available vacation time. His retirement was effective June 30, 2002.

On June 28, 2003, Plaintiff filed a complaint with the Oregon Bureau of Labor and Industries.

## **STANDARDS**

Fed. R. Civ. P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id*.

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Id*. A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir.

9 - OPINION AND ORDER

1990). When the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than otherwise would be required. *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

### **DISCUSSION**

Plaintiff alleges a single claim against Lilly for violation of Or. Rev. Stat. § 659A.230(1). The statute provides in pertinent part:

> **Discrimination for initiating or aiding in criminal or civil proceedings prohibited; remedies not exclusive.** (1) It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person . . . .

Plaintiff asserts Lilly violated the statute by constructively

10 - OPINION AND ORDER

discharging him in retaliation for his complaints about the allegedly illegal activity of Lilly employees.

To establish a constructive wrongful discharge, Plaintiff must prove, *inter alia*, that Lilly "intentionally created or intentionally maintained specified working condition(s) . . . so intolerable that a reasonable person in [Plaintiff's] position would have resigned because of them . . . ." *See McGanty v. Staudenraus*, 321 Or. 532, 557, 901 P.2d 841 (1995)(footnotes omitted). In addition, Plaintiff must show Lilly "desired to cause [Plaintiff] to leave employment as a result of those working conditions or knew that [Plaintiff] was certain, or substantially certain, to leave employment as a result of those working conditions," and that Plaintiff, in fact, quit his job because of those working conditions. *See id.* (footnote and emphasis omitted). Plaintiff, however, presents no admissible evidence to satisfy this test.

Plaintiff identifies two allegedly intolerable working conditions that forced him to resign. First Plaintiff contends he was discriminated against in his compensation because Lilly's compensation system discriminated against employees who refused to participate in wrongdoing. Plaintiff, however, does not present any evidence to support this contention. The record does not contain any evidence that Plaintiff's compensation changed after or as a result of his complaints. In fact, Plaintiff

11 - OPINION AND ORDER

testified he had been unhappy with his compensation for more than five years before he complained. Plaintiff testified, "I had an average increase in salary of $35 a month per year over a five-year period, even though I was a top performer. And I basically told [Greg Jackson], I said, 'Listen, you know, if you want me to stay and help launch this new product, pay me for what I do, for the sales results I get you, and I'll be happy to stay, but if you don't want to pay me, which you haven't in the past, I'll be happy to leave.'" Plaintiff testified he had this conversation with Greg Jackson, a Lilly manager, in 2000 or 2001.

The second allegedly intolerable working condition Plaintiff identifies stems from Plaintiff's meeting with Forrest on January 30, 2002. Plaintiff asserts Forrest threatened him during this meeting and "sought to coerce Plaintiff into complicity in the illegal conversion program." The evidence, however, does not support Plaintiff's assertion even when viewed in the light most favorable to Plaintiff. Plaintiff did not testify Forrest threatened him or insisted Plaintiff participate in any illegal activity. On the contrary, Plaintiff testified Forrest admitted Plaintiff was obligated to report violations of Lilly's GPP and should continue to do so. Plaintiff testified he and Forrest aired their differences during the meeting, and "then we kind of made up." Plaintiff ended the meeting by hugging Forrest and telling him, "You're a good guy. Thanks for

listening to me." The Court concludes a reasonable trier of fact could not conclude from Plaintiff's description of the meeting that Forrest threatened Plaintiff with discipline or termination if Plaintiff refused to participate in illegal activity.

Plaintiff also argues rumors were circulated among Lilly employees regarding Plaintiff's plans to retire before he actually made a decision to retire, other Lilly employees were told to avoid speaking and socializing with Plaintiff, and Plaintiff was excluded from training. Again, none of these assertions is supported by admissible evidence. Plaintiff's evidence consists only of his own vague and conclusory statements based almost entirely on hearsay. For example, Plaintiff asserts in his Affidavit "he was informed . . . by other sales representatives that they had been instructed by their managers to avoid speaking and socializing with me." Even if true, Plaintiff's testimony would not support Plaintiff's constructive discharge claim. Moreover, Plaintiff does not provide any evidence that other Lilly employees actually refused to talk to him or that such refusal disrupted Plaintiff's ability to do his job or resulted in an objectively intolerable working situation. In fact, Plaintiff testified he was not concerned about the alleged instruction to avoid him.

Plaintiff's allegation that he was excluded from training in retaliation for his complaints also is not supported by the

13 - OPINION AND ORDER

record.  As evidence that he was denied training, Plaintiff cites two lines in his deposition in which Plaintiff relates the following comment by Forrest:  "So as a result, he says, 'Well, I'm not going to have you come down to the meeting.'"  Without more, this testimony is meaningless.  As explained by Plaintiff on the previous page of deposition testimony, Plaintiff testified Forrest called him in April 2002 about an article that had appeared in a medical journal regarding Prozac Weekly.  Forrest asked Plaintiff whether he wanted a copy of the article, and Plaintiff declined.  Forrest then told Plaintiff that Lilly was going to have a meeting in Sacramento regarding the article and said, "I suppose you don't want to come to it then."  Plaintiff responded, "No, not really."  Even viewed in the light most favorable to Plaintiff, the Court finds neither Plaintiff's testimony nor the record as a whole supports a conclusion that Lilly denied Plaintiff a training opportunity in retaliation for his complaints.

In summary, the Court concludes Plaintiff has not produced any admissible evidence that at the time he decided to retire in April 2002 his working conditions were so intolerable that a reasonable person would be compelled to resign.  "If [the defendant] has carried its burden of production, [the plaintiff] must produce evidence in response.  In that event, he cannot defeat summary judgment with allegations in the complaint, or

14 - OPINION AND ORDER

with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.,* 343 F.3d 1107, 1112 (9th Cir. 2003)(citations omitted).

## CONCLUSION

For these reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (#22).

IT IS SO ORDERED.

DATED this 16th day of December, 2005.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge